
# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

|  |  |
|---|---|
| **MELVIN COREY MADDOX,** | ) |
| | ) |
| **Plaintiff,** | )  **Case No. 7:09CV00179** |
| | ) |
| **v.** | ) |
| | )  **MEMORANDUM OPINION** |
| | ) |
| **GENE M. JOHNSON, ET AL.,** | )  **By:  Glen E. Conrad** |
| | )  **Chief United States District Judge** |
| **Defendants.** | ) |

Plaintiff Melvin Corey Maddox, a Virginia inmate proceeding pro se, brings this action as a civil rights complaint pursuant to 42 U.S.C. § 1983, with jurisdiction vested pursuant to 28 U.S.C. § 1343. In his complaint, Maddox alleges that while he was incarcerated at Red Onion State Prison (ROSP), the defendant prison officials violated his constitutional rights by acting with deliberate indifference to his serious medical needs and by using excessive force against him. Defendant filed motions for summary judgment, and Maddox responded, making the matter ripe for decision. Upon review of the record, the court finds that the defendants are entitled to summary judgment as to Maddox's claims under § 1983.[1]

## I. Plaintiff's Claims

Maddox states and restates his claims in numerous paragraphs, pleadings, and responses, often omitting dates and repeating or adding information. The court liberally construes his

---

[1] Maddox's many related claims under state law are not independently actionable under § 1983. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Moreover, because the court has determined that the defendants are entitled to summary judgment as to all federal claims, the court declines to exercise supplemental jurisdiction over Maddox's state law claims in this action. See 28 U.S.C. § 1367(c). Accordingly, all such claims will be dismissed without prejudice.

submissions as alleging three sets of claims, arising from three different sets of facts, which the court will discuss separately.

## A. Medical Care after July 11, 2007 Incident

1. M. Collins and B. Owens denied plaintiff prompt access to medical treatment for his dislocated shoulder, in violation of the Eighth Amendment.

2. L. Mullins failed to conduct an adequate examination of plaintiff's injured shoulder, failed to provide him access to medical personnel with specialized expertise to diagnose and treat the injury, rendered treatment although she was not qualified to do so, and allowed non-medical factors to interfere with medical judgments, in violation of the Eighth Amendment.

3. L. Mullins and Vicki Phipps failed to provide plaintiff with prompt access to outside medical treatment, in violation of the Eighth Amendment.

## B. Use of OC Gas on March 17, 2008:

4. T. McCoy used excessive force against plaintiff by spraying him with OC gas when he no longer posed a security threat and acted with deliberate indifference to plaintiff's need to be decontaminated thereafter, in violation of the Eighth Amendment.[2]

5. Warden Ray and Virginia Department of Corrections (VDOC) Director Gene M. Johnson allowed policies that promoted use of excessive force after control and discipline have been restored, in violation of the Eighth Amendment.[3]

---

[2] Maddox also asserts state law claims of assault and battery against T. McCoy for these actions.

[3] Maddox also asserts a state law claim of assault and battery against Warden Ray and G. Johnson for allowing the alleged use of excessive force by T. McCoy.

## C. Other Medical Claims

6.     M. Stanley, J. Rasnick, A. Mullins, G. Kendrick, and T. McCoy denied plaintiff prompt access to medical treatment for his injured shoulder on March 17, 2008 and failed to allow him to communicate promptly with medical personnel about his need for medical treatment, in violation of the Eighth Amendment.[4]

7.     S. Church allowed non-medical factors to interfere with medical judgments, in violation of the Eighth Amendment, (a) when she failed to provide Maddox an opportunity to wash his eyes out after he had been sprayed with OC gas on March 17, 2008; and (b) later that day, when she failed to adequately assess his complaint that his shoulder was dislocated.[5]

8.     R. Kilgore and V. Phipps denied plaintiff timely medical treatment for his shoulder injury on March 17, 2008, in violation of the Eighth Amendment, by failing to assess his injury promptly, by delaying his access to outside medical expertise, and by failing to provide qualified medical staff at the prison to treat his conditions.[6]

9.     Prior to May 7, 2008, L. Yates and/or other unidentified persons illegally disclosed medical information or records without consent, in violation of plaintiff's constitutional and statutory rights to privacy and confidentiality.[7]

---

[4] Maddox also asserts state law negligence and medical negligence claims against these defendants for these actions.

[5] Maddox also asserts state law claims of negligence and medical negligence related to these actions.

[6] Maddox also asserts state law claims of negligence and medical negligence against these defendants, based on these actions.

[7] Maddox also asserts state law claims of invasion of privacy and confidentiality against L. Yates for these actions.

10. Dr. H. Smith delayed or denied plaintiff access to medical treatment recommended by a specialist, in violation of the Eighth Amendment.[8]

11. Warden Tracy S. Ray and Fred Schilling provided an inadequate medical care system in violation of the Eighth Amendment, in that it hindered plaintiff's ability to promptly communicate his need for medical care, permitted disclosure of inmates' medical information without consent, failed to provide adequate, on-site staffing by qualified medical professionals, and allowed nonmedical factors, such as rules and regulations, to interfere with decisions about appropriate medical care.[9]

Defendants Smith, Kilgore, Church, Yates, L. Mullins, and Phipps (the medical defendants) filed a motion for summary judgment, and defendants Ray, Johnson, Collins, Schilling, McCoy, Kendrick, Rasnick, A. Mullins, Owens, and Stanley (the security defendants) filed a separate motion for summary judgment. After engaging in discovery,[10] Maddox

---

[8] Maddox also asserts a state law claim of medical malpractice against Dr. Smith for these actions.

[9] Maddox also asserts related state law claims of negligence and invasion of privacy for these actions.

[10] Maddox complains that in discovery, the medical defendants failed to provide him with X-rays taken on April 14, 2008, and with "the communication concerning the forwarding of [his] medical records to MCF (VCU)." (Docket Entry (DE) 107, p. 3.) As he fails to indicate how lack of these materials has hindered his ability to respond to the issues on summary judgment, however, the alleged deficiency in discovery responses does not preclude the court from addressing defendants' motions. See Fed. R. Civ. P. 56(f) (requiring party opposing motion for summary judgment to show by affidavit specified reasons it cannot present facts essential to justify its opposition); see, e.g., Summers v. Leis, 368 F.3d 881, 887 (6th Cir. 2004) (finding that under Rule 56(f), plaintiff must "state with some precision the materials he hopes to obtain with further discovery, and exactly how he expects those materials would help him in opposing summary judgment").

responded to defendants' summary judgment motions with a brief in opposition, a statement of disputed facts, an "affidavit," a "declaration," and exhibits, a total of 245 pages in all.[11]

## II. Discussion

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is properly granted if "there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Indust., Inc., 763 F.2d 604, 610 (4th Cir. 1985). Rule 56(c) mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex v. Catrett, 477 U.S. 317, 322 (1986).

A verified complaint filed by a pro se prisoner, stating factual allegations based on personal knowledge, is to be considered as the equivalent of an affidavit and may defeat a motion

---

[11] After defendants filed their motions for summary judgment, Maddox filed a motion for interlocutory injunctive relief. Among other things, he alleged that he had received inadequate medical treatment for his shoulder condition even after the time period covered in the complaint. In response to a show cause order, defendants submitted additional affidavits and medical records. By prior memorandum opinion and order, the court denied the motion for interlocutory relief. The court notified Maddox that the evidence submitted in response to that motion would also be considered to the extent that it is relevant to the issues defendants have raised in their motions for summary judgment. He has filed no further response to the medical claims, based on this information, although granted an opportunity to do so.

for summary judgment. <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991); <u>Davis v. Zahradnick</u>, 600 F.2d 458 (4th Cir. 1979). Although the court must view genuinely disputed facts in the light most favorable to the nonmovant, the court "need not accept the legal conclusions drawn from the facts" and "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." <u>Kloth v. Microsoft Corp.</u>, 444 F.3d 312, 319 (4th Cir. 2006) (omitting quotation). To defeat a supported motion for summary judgment, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (omitting quotation).

### A. July 11, 2007 Shoulder Injury

#### 1.

Maddox's claims concerning this incident must be determined from the following sequence of events, based on Maddox's allegations and defendants' evidence, taken in the light most favorable to Maddox as the nonmovant. Around 6:15 p.m. on July 11, 2007, while working out in his cell at ROSP, Maddox injured his right shoulder. Maddox spoke to Officer M. Collins by intercom, asking her to call the medical unit and the lieutenant because he believed that his shoulder was dislocated. Collins refused to call the lieutenant and cut the intercom on and off in such a way that Maddox could not communicate to her further about his injury.[12] Maddox then

---

[12] Collins does not recall talking to Maddox on the intercom on July 11, 2007, and states that if she had, she would have noted that fact in the control room log book. She states that if he had reported a medical emergency to her over the intercom, she would have noted the conversation and notified the medical unit. Collins did make a note that night that Maddox was beating on his door and that floor officers and then a nurse went to talk to him.

began beating on his door with his cup, so that officers would call the lieutenant and medical. He also asked other inmates to call officers on their intercoms to ask for medical assistance on Maddox's behalf, while he himself continued to beat on his door.

Officer B. Owens, making security rounds, came to Maddox's cell. Maddox showed him his "visibly dislocated shoulder" and asked him to call medical and the lieutenant, because he had dislocated his shoulder and needed to see a nurse. Owens told Maddox that the lieutenant would make his rounds soon. Maddox and another inmate continued to beat on their doors. Some time later, Owens came by Maddox's cell again. When Maddox asked if Owens had called medical yet, Owens said he was going to call. Maddox continued to beat on his door. About 7:39 p.m., Officer J. Tompkins came to see why Maddox was banging his door. Tompkins said he would call the lieutenant, but did not call medical. Shortly, Lt. Younce came to Maddox's cell, observed his shoulder, and called the medical unit.

In response, Nurse L. Mullins came to evaluate Maddox's injury through his cell door window. Maddox informed the nurse that he was in severe pain (a "9" on a scale of 1-10) and asked to be taken immediately to a hospital. The nurse noted that Maddox's shoulders appeared to be uneven. She told Maddox that he would receive Motrin and be placed on the list to see the doctor the next day, but said that she would contact her supervisor to see if anything else could be done for Maddox. Shortly, officers escorted Maddox to the medical unit. Nurse Mullins informed him that her supervisor, Nurse Phipps, had advised that Maddox was to receive Motrin and see the doctor the next day. Nurse Mullins then provided him with the medication and asked if he wanted to stay in a medical unit cell for the night for observation. Maddox signed a refusal and was escorted back to his cell.

- 7 -

At 8:57 p.m., Maddox filed an emergency grievance, complaining that Collins had refused to call medical or talk to Maddox on the intercom. At 9:24 p.m., he filed a second emergency grievance complaining that he should have been taken to the hospital immediately to have his shoulder reset. He attempted to request medical treatment via the intercom at about 9:38 p.m., but Collins cut the intercom on and off without answering him. By about 10:05 p.m., Maddox began feeling "numbness in his arm and lack of movement in his fingers." When Owens came by on security rounds, Maddox asked him to notify medical about the numbness, but Owens failed to do so. Maddox filed an emergency grievance at around 11:27 p.m., complaining about the numbness and difficulty moving his fingers. Nurse Mullins responded to both emergency grievances, indicating that the situation was not an emergency and that Maddox was on the list to see the doctor the next day. A nurse provided him with another dose of Motrin at 1:27 a.m.

Dr. Happy Smith examined Maddox's shoulder on July 12, 2007 at about 10:45 a.m. He determined that Maddox's shoulder was dislocated and ordered that he be taken to the emergency room, stating, "I would reset it here, but we don't have an X-ray technician here." At Dickenson Community Hospital, doctors took an X-ray of the shoulder, put Maddox to sleep, and reset the shoulder.

### 2.

The United States Supreme Court has held that punishments or prison conditions are "repugnant to the Eighth Amendment" if they "are incompatible with "the evolving standards of decency that mark the progress of a maturing society . . . or . . . involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 102 (1976) (internal quotations

omitted). To prove that medical treatment he received while a prisoner amounted to a constitutional violation, an inmate must show that personnel to whose care he was committed exhibited "deliberate indifference" to his "serious medical needs." Id. at 104-105.

First, the prisoner must demonstrate a medical need serious enough to give rise to a constitutional claim. "[A] serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (internal quotations omitted); Cooper v. Dyke, 814 F.2d 941, 945 (4th Cir. 1987) (determining that intense pain from an untreated bullet wound is sufficiently serious); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1974) (concluding that the "excruciating pain" of an obviously broken arm is sufficiently serious to survive a motion to dismiss under Rule 12(b)(6)).

Second, plaintiff must show that the official was aware of facts from which he could draw an inference that a substantial risk of harm existed, that he drew or must have drawn that inference, and that he failed to respond reasonably to the risk. Farmer v. Brennan, 511 U.S. 825, 837-844 (1994). Prison personnel may rely on the opinion of the medical staff as to the proper course of treatment. Miltier v. Beorn, 896 F.2d 848, 855 (4th Cir. 1990). Inadvertent failure to provide treatment, negligent diagnosis, and medical malpractice do not present constitutional deprivations. Estelle, 429 U.S. at 105-106. A claim concerning a disagreement between an inmate and medical personnel regarding diagnosis and course of treatment does not implicate the Eighth Amendment, because questions of medical judgment are not subject to judicial review. Wright, 766 F.2d at 849; Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975).

### a. M. Collins and B. Owens

Maddox sues M. Collins for failing to report his shoulder injury to medical immediately after he and other inmates informed her about it over the intercom. He sues B. Owens for twice failing to call the medical unit after Maddox showed him his "visibly dislocated shoulder." These officers do not remember, and made no contemporaneous notation of, these alleged encounters with Maddox, and they both indicate that if they had received a report of such an injury, they would have notified the medical unit and made a record of the incident. These memory differences, however, do not constitute a material issue of fact.

An unreasonably lengthy delay in obtaining medical attention for an injury that is causing significant pain, such as a broken arm, can constitute deliberate indifference under Estelle v. Gamble. See Loe, 582 F.2d at 1296. Maddox asserts that he suffered such a delay. The facts, taken in the light most favorable to him, do not support this assertion. His injury, which he believed was a shoulder dislocation, occurred at 6:15 p.m., and he notified Collins immediately via intercom. The log book indicates that at 7:10 p.m., Owens spoke to Maddox, because he was kicking his door. Further logbook entries indicate that Nurse L. Mullins entered the housing unit at 7:55 p.m., and that at 8:05 p.m., officers escorted Maddox to the medical unit. Mullins then provided him with Motrin for pain. Thus, the delay in treatment resulting from Collins' alleged failure to act was, at most, one hour and forty-five minutes, and the delay occasioned by Owens' alleged failure to act was less than an hour. Moreover, Nurse Mullins and her supervisor, Nurse Phipps, in their medical judgment, determined that the only treatment Maddox's injury required in the short term was pain medication and that delaying further evaluation and treatment until the

prison doctor could examine Maddox's injury in the morning, approximately sixteen hours later, did not present a substantial risk of serious harm. By comparison to this medically approved delay, the relatively minor delay in treatment allegedly attributable to Collins and Owens cannot be termed unreasonable or unconstitutional. See Farmer, 511 U.S. at 844 (finding that deliberate indifference standard requires actual recognition of substantial risk of harm and unreasonable response to it).

Maddox also complains that later that night, when he made additional complaints of pain and requested medical attention, Collins and Owens did not relay his requests to medical staff. As indicated, the nurses had already decided that Maddox's shoulder could wait until morning for a doctor's evaluation and had provided pain medication. The correctional officers, with no medical training, could reasonably rely on the nurses' determination that appropriate treatment had been provided in the meantime. Miltier, 896 F.2d at 855. Furthermore, the next morning, Dr. Smith provided no additional treatment before sending Maddox to the hospital for X-rays and correction of the dislocation. Thus, Maddox fails to demonstrate a serious medical need for any additional medical treatment overnight. Finding no genuine issue of fact in dispute as to this element of Maddox's claim, the court concludes that Collins and Owens are entitled to summary judgment as a matter of law as to Claim 1.

### b. Nurse L. Mullins and Nurse V. Phipps

Maddox complains that on July 11, 2007, Mullins and Phipps should have arranged for him to be transported immediately to an outside hospital for X-rays and assessment and treatment by an expert. Without question, a dislocated shoulder presents a serious medical need and a substantial risk of harm if no treatment is provided in a timely manner. Maddox's allegations,

- 11 -

however, ask the court to decide that the nurses knew his shoulder was dislocated and, therefore, that he needed to be transported immediately to a hospital for evaluation and treatment or he would face a substantial risk of harm from the injury. In fact, the record supports no such conclusion. Nurse Mullins observed that the inmate's shoulders were uneven and that he complained of severe pain. She was not required to credit Maddox's own self-diagnosis that his arm was pulled out of the socket. Rather, she made a medical judgment that although she could give him some immediate treatment in the form of pain medication, additional examination to diagnose the exact nature of the injury and recommendation for further treatment would need to come from the doctor. She and Phipps also made a medical judgment that waiting until morning to see the doctor did not place Maddox at a substantial risk of serious harm. Maddox's disagreement with these professional decisions cannot support a finding of deliberate indifference. Wright, 766 F.2d at 849. See also Bean v. Dormire, No. 06-4291-CV-C-SOW, 2008 WL 2230695 (W.D. Mo. 2008) (finding, based on treating physician's affidavit, that twelve-hour delay between inmate's report of possible shoulder dislocation and examination by physician, without pain medication, was not medically unreasonable, as evidence did not indicate, and defendants did not believe, condition was a medical emergency); Sykes v. District of Columbia, Civ. A. No. 94-1986 SSH, 1994 WL 646162 (D. D.C. 1994) (finding that 13-hour delay for treatment of a dislocated or broken finger cannot be characterized as posing a "substantial risk of serious harm").

Mullins made similar medical judgments upon receiving Maddox's emergency grievances later that evening. The court cannot second guess Mullins' medical judgment that waiting for the doctor to assess the new symptoms in the morning did not present a substantial risk of serious

- 12 -

harm to Maddox. As Maddox thus fails to present any genuine issue of material fact to be resolved under the Eighth Amendment analysis, Mullins and Phipps are entitled to summary judgment as a matter of law as to Claims 2 and 3.

## B. March 17, 2008 OC Spray Incident

### 1.

On March 17, 2008 about 11:40 a.m., while officers were serving the lunch meals to the inmates in their individual cells, Maddox wrapped an item of clothing around his tray slot so that its outside door could not be closed and secured. Sgt. Kendrick and then Lt. McCoy came to Maddox's cell to address the situation, and an officer began videotaping the incident.[13] Maddox, who had opportunity to review the videotape, relies on it as an accurate reflection of what happened next.[14]

As the videotape opens, Kendrick explains that Maddox has blocked his tray slot door with his shirt, covered his window, and placed his mattress in front of his tray slot. Two officers stand in front of Maddox's cell door, holding the tray slot cover box which protects the officers from inmate assaults through the tray slot. Kendrick twice orders Maddox to remove the items so that the officers can close the tray slot door and continue the meal service. Through a window in the cover box, Maddox can be seen, reaching through the tray slot, removing an item, and then looking out through the slot at the officers.

---

[13] The officers do not identify themselves on the videotape. However, from the parties' submissions, it is apparent that these officers are Sgt. Kendrick and Lt. McCoy.

[14] Maddox also requested production of videotape footage of the March 17, 2008 incident taken by the stationary surveillance cameras in the unit. The court directed defendants to produce copies of any available videotape footage of the incident, and defendants certified that only the handheld camera footage was available.

McCoy then comes to the cell door and twice orders Maddox to remove his shirt from the tray slot, too. The tray slot opening goes dark. Again, McCoy orders Maddox to "take it down." The tray slot remains dark, and the cell window stays covered.

McCoy then raps on the door and twice orders Maddox, "Take it down and talk to me." Maddox then appears at the window and "talks" to the officer, although Maddox's words are all but unintelligible on the videotape recording. He is apparently angry that he has not been seen by medical staff. The lieutenant says he will see medical soon. Maddox looks out his cell window, watching as McCoy puts on rubber gloves. Maddox makes no further, visible move to unblock the slot, however. McCoy asks him again, "What's it going to be? Are you going to pull that in or not? We're getting ready to spray." He receives no response from Maddox.

McCoy pulls on the garment in the tray slot, but it appears to be stuck. At this point, the officers remove the tray slot cover box and replace it with a small, rectangular, plexiglass cover. The garment is still visible around the sides of the slot opening. McCoy orders Maddox again to remove the mattress from in front of the slot. When he gets no response, he sprays one-half to one second burst of OC pepper spray into Maddox's cell, using the spray wand of the MK-46 spray cannister to reach through the tray slot and penetrate the mattress on the other side.

Kendrick continues to hold the plexiglass cover in place, while McCoy and other officers attempt, unsuccessfully, to remove the garment from around the slot by pulling on it and decide they must use seatbelt cutters. McCoy goes out of view of the videotape for a few seconds, then returns to the cell door and again orders Maddox to remove the mattress. McCoy then goes out of view of the videotape once more. Maddox pulls aside the window cover and looks out, holding a towel over his nose and mouth. A few seconds later, he removes the window covering

altogether as he coughs into the towel several times.[15]   The officers with the seatbelt cutters arrive and cut away the garment from around the slot.  A voice off camera says, "Come on out. Let's get you to the shower."  McCoy then returns to Maddox's door, and Kendrick secures the outside tray slot door with a chain.

McCoy tells Maddox, repeatedly and loudly, that if he wants to go to the shower to be decontaminated, he must remove the mattress, drop the items in his hands, and back up to the tray slot to be cuffed up for escort to the showers.  With each verbal command, McCoy also motions with his hands for Maddox to turn around and put his hands behind his back to be cuffed.  Maddox stands at the window, sometimes responding verbally, sometimes coughing lightly into the towel.  At one point, McCoy begins to open the tray slot door, but as he looks into the cell, he states that Maddox is now holding a tray lid up against the tray slot opening.  McCoy asks again if Maddox wants to be decontaminated, and Maddox nods.  When McCoy, repeatedly and loudly, describes and acts out the cuffing procedures, Maddox cups a hand to his ear.[16] McCoy warns him that if he does not comply with cuffing procedures, the officer will take that as a refusal to be decontaminated.  Maddox simply stares out the window with the towel over the lower portion of his face.

Then, Kendrick shouts directly through the window, four times, telling Maddox that if he wants to be decontaminated in the showers, he must drop the towel and the things in his hands,

---

[15] The parties agree that, at some point during this period, McCoy sprayed a second burst of OC spray into Maddox's cell through a side vent.  This action occurred out of the range of the video camera, which continued to view the door of Maddox's cell.  McCoy asserts that he sprayed into Maddox's cell a second time before the tray slot was secured, while Maddox contends that McCoy sprayed the second burst into the cell after the slot was secured.

[16] Maddox alleges that he could not hear what McCoy was saying, as the officer described what he needed to do in order to be taken to the showers for decontamination.

back up to the tray slot, and be cuffed. Kendrick acts out the procedure, as Maddox continues to stand in the window, holding the towel over his face.

A female officer comes to the window and asks Maddox if he wants decontamination; he appears to nod. When she tells him to take the towel off his face and turn around to be cuffed, Maddox puts a hand up to his ear and continues to stand staring out the window. He does not appear to be in distress from the spray, and at one point, he appears to take a drink from a cup. A nurse arrives and advises him to wash his eyes out with water. He disappears from the window momentarily. An officer reports, however, that instead of trying to wash the OC spray out of his eyes, Maddox is talking on the intercom to someone.

At 11:59 a.m., twenty minutes after the start of the videotape, the officers step out into the hallway for debriefing. They state that Maddox has refused to be decontaminated and that the nurse has advised him to wash the spray from his eyes with water.

## 2.

"After incarceration, only the unnecessary and wanton infliction of pain on prisoners constitutes cruel and unusual punishment" in violation of the Eighth Amendment. Whitley v. Albers, 475 U.S. 312, 319 (1986) (internal quotations omitted). On the other hand, not every malevolent touch by a prison guard amounts to deprivation of constitutional rights. Hudson v. McMillian, 503 U.S. 1, 9 (1993).

> For an inmate to prove an excessive force claim, he must satisfy not only the subjective component that the correctional officers acted with a sufficiently culpable state of mind, but also the objective component that his alleged injury was sufficiently serious in relation to the need for force to establish constitutionally excessive force.

Stanley v. Hejirika, 134 F.3d 629, 634 (4th Cir. 1998). Plaintiff must prove that, subjectively, the force was applied "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline." Id. (quoting Whitley, 475 U.S. at 320-21). This determination considers these factors: the amount of force used as related to the need for force, the threat reasonably perceived by the officers, and any attempts the officers made to "temper the severity of a forceful response." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996).

To prove the second component of his excessive force claim, the inmate "must show that correctional officers' actions, taken contextually, were 'objectively harmful enough' to offend 'contemporary standards of decency.'" Stanley, 134 F.3d at 634 (quoting Hudson, 503 U.S. at 8). This part of the analysis "evaluates the force applied and the seriousness of the resulting injury against the need for the use of force and the context in which that need arose." Id. Prison administrators are entitled to broad deference in determining what policies and practices are necessary to preserve or restore security and order. Id.

> Thus, when prison security measures are taken in response to an uprising or prison disturbance, the courts cannot always expect a perfectly measured response. "The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense."

Id. (quoting Whitley, 475 U.S. at 326).

In short, the "core judicial inquiry [is] . . . the nature of the force—specifically, whether it was nontrivial and was applied . . . maliciously and sadistically to cause harm." Wilkins v. Gaddy, ___ U.S. ___, 130 S. Ct. 1175, 1179 (2010). The extent of the injury the inmate suffered

is relevant to both of these determinations: as a factor in determining "whether use of force could plausibly have been thought necessary in a particular situation" and as "some indication of the amount of force applied." Id. at 1178.

In the context of prison living conditions, an inmate must establish by a preponderance of the evidence that the prison official acted with deliberate indifference (subjective component) to a substantial risk of harm (objective component). Hudson, 503 U.S. at 8. "To the extent that [prison living] conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). To prove deliberate indifference, the inmate must show that the official was aware of facts from which he could draw an inference that a substantial risk of harm existed, that he actually drew that inference, and that he disregarded the risk by failing to take "reasonable measures" to alleviate the risk. Farmer, 511 U.S. at 835-37. "[T]o demonstrate that a deprivation is extreme enough to satisfy the objective component of an Eighth Amendment [conditions] claim, a prisoner must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995) (omitting internal quotations).

Ordinarily, the requirement that courts must view the facts and draw reasonable inferences in the light most favorable to the party opposing a summary judgment motion requires adopting the plaintiff's version of the facts. On the other hand, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott, 550 U.S. at 380 (omitting internal quotations, alterations,

and citations) (rejecting plaintiff's version of facts as inconsistent with unchallenged videotape recording). In particular, where the record contains a videotape capturing the events in question, on which plaintiff relies, the court must credit the plaintiff's version of the facts only to the extent it is not contradicted by the videotape. See Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008).

### 3.

In Claim 4, Maddox alleges that on March 17, 2008, Lt. McCoy used excessive force against plaintiff by spraying him the second time with OC gas after he had removed the item of clothing from the tray slot as requested.[17] Maddox argues that by this point in time, he was behind a closed tray slot and a locked door and thus, no longer posed a security threat. He also complains that McCoy maliciously allowed him to suffer harm from the spray by refusing to take him to the showers for decontamination and by leaving him in his cell with the water turned off. In Claim 5, Maddox alleges that Warden Ray and VDOC Director Johnson should be held responsible for the violations committed by McCoy on March 17, 2008, because he acted pursuant to policies for which these supervisory officials are responsible, allowing use of force against inmates who are no longer a security threat. As stated, Maddox's responses to the motion

---

[17] In his initial complaint, Maddox alleged that both bursts of OC gas came after the tray slot was secured. After he was allowed to view the handheld videotape footage, however, he altered his claim and now alleges that only the second burst was excessive, because it came after the tray slot was closed.

In any event, Maddox cannot establish a genuine issue of material fact as to a claim that the first burst of OC gas was excessive force. The videotape footage of the incident clearly reflects that McCoy gave numerous verbal orders directing Maddox to remove the mattress that Maddox was using to block his tray slot door from closing, that he warned Maddox of the OC spray to follow if he did not comply, and that he actually had to apply the spray through the mattress, because Maddox refused to remove it as ordered. As this footage clearly contradicts Maddox's allegations that McCoy applied the first burst of OC spray against a nonresistant inmate, the court need not accept Maddox's allegations as true in this respect. Iko, 535 F.3d at 230. The court will grant defendants' motion for summary judgment as to the portion of Claim 4 regarding McCoy's application of the first burst of OC gas.

for summary judgment rely on the videotape recording as an accurate depiction of relevant events on March 17, 2008.[18]

Contrary to Maddox's allegations, the videotape does not support a finding that McCoy applied the second burst of OC gas "maliciously or sadistically for the very purpose of causing harm" to an inmate who no longer posed a threat. Maddox admits, and the videotape reflects, that although officers closed the tray slot door after the first burst of OC spray, Maddox's garment still hung out from below the door's edges, a clear indication that the tray slot door could not be properly secured. At that time, Maddox was also still refusing to remove the covering over his cell door window and was holding items over the tray slot opening. McCoy and the other officers gave Maddox numerous verbal orders to clear his tray slot, but he failed to comply with these orders. Hence, he continued to pose a threat to the security and order of the facility after the first burst of OC spray, despite being behind a locked cell door and a closed tray slot door.

While the videotape does not show McCoy actually spraying the second burst of OC gas into Maddox's cell, both of the brief periods when McCoy is out of view of the video camera occur before or during other officers' efforts with the seatbelt cutters to remove the garment from Maddox's tray slot door and before Maddox removes the cover from his window. Only after the garment is removed do the officers properly secure the outside tray slot door with its chain. Thereafter, Maddox still refuses to comply with the officers' instructions to remove other items

_____

[18] In his response to McCoy's motion for summary judgment, Maddox also attempts to rely on videotape footage taken by the surveillance cameras in the pod on March 17, 2008. As stated, defendants have certified to the court that the handheld videotape recording is the only available footage of the events at issue. Maddox cannot rely on evidence that does not exist to create a genuine issue of material fact.

(first, the mattress and then the dinner tray lid) from in front of the inside tray slot. Therefore, the court believes that the videotape clearly demonstrates that McCoy's application of a second burst of OC spray at any point in time during this period was part of his ongoing, good faith effort to restore order and was not intended merely to inflict harm.

To the extent that the videotape directly contradicts the allegations in Maddox's verified complaint and responses, the court need not credit his version of facts as true for purposes of summary judgment. Iko, 535 F.3d at 230. Finding no genuine issue of material fact in dispute, the court will grant McCoy's motion for summary judgment as to Maddox's claim that this defendant used excessive force against him on March 17, 2008.

Similarly, the record does not support Maddox's claim that McCoy violated his constitutional rights by not removing him from the cell immediately for decontamination. First, the videotape reflects that McCoy responded reasonably to the risk of harm the OC gas posed to Maddox. Farmer, 511 U.S. at 835-37. Immediately after the OC bursts, McCoy and other officers repeatedly offered Maddox the opportunity to leave his cell and be decontaminated in the shower and repeatedly informed him, verbally and through gestures, of the necessary procedures he would have to follow in order to receive this accommodation. No reasonable factfinder, viewing the videotape, could believe that Maddox did not hear the officers' repeated orders or understand their hand motions, directing him to turn around and be cuffed if he wanted to be decontaminated in the shower. Certainly, an inmate can "refuse" an offered accommodation by failing to comply with required procedures under which prison officials provide that accommodation. Thus, the fact that Maddox did not verbally refuse decontamination is

irrelevant, because the videotape clearly demonstrates that he failed to comply with standard cuffing procedures so the officers could take him to the showers.

Maddox's grievances about this event indicate his belief that "other protocols . . . could have been used to evacuate [him] from a polluted cell." (DE 97, Exh. 14, p. 2.) Inmates, however, cannot use misbehavior to force officials into taking specific measures in response. McCoy states that "[f]or the safety of staff and the offender, disruptive inmates refusing decontamination are not brought out of the cell because it presents the opportunity for further aggressive behavior." (DE 69, Exh. V, ¶ 6.) The court must defer to prison officials' expertise in formulating this policy as necessary for maintaining prison order and security. Hudson, 503 U.S. at 8. Because McCoy responded reasonably to the risk of harm, the court cannot find that McCoy acted with deliberate indifference as defined in Farmer in failing to remove Maddox from the contaminated cell after the spray incident. 511 U.S. at 835-37.

Moreover, viewing Maddox's behavior, as reflected on the videotape, McCoy and the other officers could have believed that the OC gas in the cell was not causing Maddox any severe distress. The fact that he stood calmly at the window and failed to comply with cuffing procedures to leave the cell immediately could reasonably have caused the officers to believe that he faced no substantial risk of harm from remaining in the cell without decontamination. Officers who do not know of a substantial risk of harm cannot be found deliberately indifferent in failing to address that risk. Id. In any event, Maddox's own choices caused any harm he suffered from staying in the contaminated cell. He chose to be disruptive in the first place, then chose not to comply with orders to remove the items from in front of the tray slot, and then chose to ignore repeated offers of decontamination. He cannot recover damages from prison officials

for problems that he clearly brought upon himself. For the stated reasons, the court will grant defendants' motion for summary judgment as to Claim 4 in its entirety.[19]

The court will also grant defendants' motion for summary judgment as to Claim 5, alleging that McCoy's use of excessive force on March 17, 2008 was pursuant to policies promulgated by Defendants Ray and Johnson. Because Maddox fails to present any genuine issue of material fact as to the excessive force claim, he fails to present any triable issue regarding VDOC policies concerning the use of force. Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (recognizing that supervisory liability may attach only if supervisor knew that subordinate's conduct posed unreasonable risk of constitutional injury to citizens and failed to act to prevent such constitutional injury).

---

[19] Maddox claims that McCoy turned off the water to his cell at the same time he sprayed the second burst of OC spray through the side vent and that this action represented deliberate indifference to a substantial risk that Maddox would be harmed if he had no water in his cell to wash off the OC spray. Even assuming that McCoy turned off the water to Maddox's sink, the record does not support a finding that he did so with any intent of denying Maddox an opportunity to decontaminate. McCoy states that the water was turned off to prevent Maddox from flooding his cell. Thereafter, McCoy made multiple attempts to convince Maddox to comply with cuffing procedures so that he could be decontaminated in the shower. Moreover, Maddox does not allege making any attempt to wash off the OC spray in his cell or making any request for the water to be turned back on. The record clearly indicates that whatever harm Maddox suffered as a result of being unable to wash in his cell, he brought on himself by failing to comply with officers' orders so that he could be decontaminated in the shower.

### C. Other Medical Claims

### 1.

The remainder of Maddox's claims concern ongoing problems and delays he allegedly encountered in obtaining decontamination from the OC spray and in obtaining long-term medical treatment of the shoulder condition caused by his injury on July 11, 2007 and aggravated by subsequent injuries. The evidence, taken in the light most favorable to Maddox, indicates the following course of events relevant to these claims.

During recreation period on July 15, 2007, Maddox told an officer that his hand was swollen, he could not move his fingers, his arm hurt, and he needed to see medical staff. After recreation concluded, a nurse evaluated Maddox's arm through his cell window and advised him to use cold compresses and contact medical if the swelling did not go down by evening. At about 6:15 p.m, Maddox filed an emergency grievance about continuing problems with pain in his arm, swelling in his hand, and difficulty moving his fingers. He also filed informal complaints and then grievances, asserting that officers had denied him the ability to communicate his medical needs more promptly to medical staff and that the treatment he received was delayed and inadequate.[20]

On July 18, 2007, Dr. McBride examined Maddox's right hand, prescribed Prednisone for the swelling, and stated that he would try to get approval for a consultation with a neurologist. Dr. Bellamy saw Maddox on July 23, 2007 and said his medication would start soon. On August 2, 2007, Dr. Bellamy told Maddox that he had been approved for an EMG test. Maddox filed an

---

[20] Maddox complains that the nurses "failed to inquire into the essential facts that were necessary to make a professional judgment" about what treatment was appropriate for his shoulder injury. (DE 1, p. 16.)

- 24 -

emergency grievance on September 9, 2007, complaining of continuing pain in his arm and hand and asking to be placed on the list to see the doctor. Nurse Deel examined Maddox the next day, provided him with Motrin, and placed him on the list for a doctor visit.[21]

Officers transported Maddox off-site on September 18, 2007 to be examined by S. C. Kotey, M.D., an orthopedic specialist, who recommended follow up after the EMG test was performed. Maddox filed informal complaints and emergency grievances during the next couple of weeks, complaining of continuing pain, advising that the Motrin was not helping, and asking for rehabilitative treatment.

While officers were taking Maddox off the recreation yard on October 22, 2007, his shoulder "slipped out of joint and back in." The officers escorting him notified their sergeant, who allowed Maddox to be double cuffed during transport back to his cell. Back in his cell, at about 3:32 p.m., Maddox filed an emergency grievance about this new shoulder problem, indicating that he was in "a lot of pain." This grievance was denied as not an emergency. Maddox stabilized his shoulder with a homemade sling and purchased pain relief medication from the commissary. On October 29 and November 1, 2007, Maddox filed additional emergency grievances about this new problem with his shoulder, slipping in and out of joint, and continuing pain. Medical staff, at sick call on November 2, 2007, advised Maddox that a doctor would examine his shoulder after the EMG test.

Maddox underwent an EMG on December 13, 2007. Dr. Bellamy advised Maddox on December 13, 2007 that the EMG test results indicated nerve damage in the shoulder that could

---

[21] Maddox complains that he was not actually seen by a doctor on this occasion.

be permanent. Maddox had a follow up visit with Dr. Kotay, the orthopedic specialist, on January 22, 2008. Dr. Kotay's report indicated his observation that the EMG results appeared to reflect "peripheral neuropathy," but the fact that Maddox was able to straighten out his fingers voluntarily indicated no "obvious problem." (DE 97, Exh. 44.) Nevertheless, he allegedly told Maddox that he "wanted" to refer Maddox to a neurologist.[22] Maddox's February 20, 2008 request for a follow up visit with Dr. Kotay was denied.

As discussed in Section B, supra, on March 17, 2008, around 11:40 a.m., Maddox was twice sprayed with OC gas. After Maddox failed to comply with numerous opportunities to be removed from his cell for decontamination in the shower, Lt. McCoy had Nurse Church talk to Maddox. She once more offered Maddox the chance for decontamination in the shower, if he would only turn around and be handcuffed. When he still failed to comply with this requirement, she explained that he should wash the OC spray out of his eyes, using water from the sink in the cell. Maddox alleges that the water to his sink had been shut off.

About an hour later,[23] Maddox stood on his sink to talk through his top vent, began choking on the OC gas, and fell off the sink. In the fall, he reinjured his right shoulder, bruised his arm, and cut his finger. Maddox showed Officer Stanley that his shoulder was "visibly dislocated" and asked him to call the lieutenant and medical. Stanley failed to do so. Maddox

---

[22] Maddox asserts that Dr. Kotay "ordered" follow up care that he never received. The medical records indicate, however, that Dr. Kotay was a consulting specialist and not Maddox's treating physician. The copy of his report that Maddox submits merely stated Dr. Kotay's personal belief that his own assessment (that nerve damage from Maddox's shoulder injury was not an "obvious problem") "need[ed] to be confirmed by a Neurologist, to make sure that there are no other problems." (DE 97, Exh. 44.)

[23] Maddox alleges that he started asking officers to contact the medical unit about his new shoulder injury around 12:40 p.m.

asked Officer Mullins over the intercom to notify medical, but Mullins stated that he could not hear what Maddox was saying and cut off the intercom. Maddox then showed his injuries to Officer Rasnick as he was walking past the cell, and Rasnick agreed to call the sergeant. When another inmate called the control booth, asking on Maddox's behalf that medical be notified, Officer Mullins cursed and refused.

Maddox wrote an emergency grievance at 1:31 p.m., stating that he had fallen off his sink, had dislocated his shoulder, and had been seeking medical attention since 12:40 p.m. Sgt. Kendrick came to Maddox's cell about 2:06 p.m., and Maddox told him about his injuries. Kendrick declined to sign an emergency grievance, but stated that someone would look at the inmate's injuries.

When Lt. McCoy came by Maddox's cell on his way to conduct classification proceedings, Maddox asked him for medical attention. McCoy told him to "put in for sick call." Maddox told McCoy that a sick call request would take four days, when Maddox believed he needed medical attention immediately. McCoy said, "I can't hear you," in reference to Maddox's claim that he could not "hear" McCoy during the tray slot incident earlier that day.

While Nurse Church conducted pill pass, Maddox showed her his emergency grievance, but she did not take it. Nurses are not permitted to pick up inmates' paperwork during pill pass. Inmates must utilize the institutional mail to apply for medical sick call.[24] Maddox finally filed his emergency grievances about his shoulder dislocation about 4:30 p.m. Nurse Kilgore

---

[24] Nurse Church provides this information in her affidavit, and Maddox does not dispute her statement.

responded, stating that the situation was not an emergency and that Maddox had been "seen" by medical.

Nurse Kilgore later came to Maddox's cell to evaluate him at about 8:42 p.m. on March 17, 2008. She then informed him that Nurse Church had seen him earlier in the afternoon and had reported that his shoulders appeared to be even and that she saw no pain in his face. Nurse Kilgore told him that if his shoulder had been dislocated during her examination, he would have "been off the floor," and that he needed to "stop being mad and act right." (Compl. ¶ 84.) At about 9:45 p.m., officers escorted Maddox to a medical unit cell. The next morning, Maddox signed a release form to have his medical records released, and was then sent to Dickenson Community Hospital, where his shoulder was X-rayed. He was then sent to Norton Community Hospital to have his shoulder reset. At Norton, doctors determined that the shoulder was not dislocated, diagnosed the injury as a possible rotator cuff tear, and recommended that he receive an MRI and be evaluated by a shoulder specialist.[25]

In the following days, Maddox filed emergency grievances on March 23, 24, and 25, 2008, stating that he was in pain, but was not receiving his medication and that his fingers were numb. During evening pill pass, Maddox informed Nurse Kilgore that he was not getting his medication. She returned shortly with the pain medication, stating, "I missed the new order." Maddox filed a request on March 27, 2008 to see the doctor about his shoulder and hand. He filed an emergency grievance on March 29, 2008, saying that he had pulled something while doing a shoulder stretch, and his arm felt weak and asleep. He was scheduled for sick call. On

---

[25] Maddox asserts that he did not receive an MRI of his shoulder until May 4, 2009.

March 31, 2008, Nurse Church examined him and placed him on the doctor's list. Then, on evening pill pass, Church told Maddox that he had been approved to see a neurologist and that the doctor would see him after the appointment with the specialist. On April 1, 2008, Maddox received a steroid shot in his arm and was admitted to medical. The next day, Dr. McBride told him that further treatment of his shoulder would be "put off" until after a neurology consult.

In mid-April 2008, Maddox filed additional complaints about pain in his wrist and fingers, asking to see a doctor. Dr. Bellamy examined Maddox on April 23, 2008. She prescribed two new medications, Naprosyn and Neurotin, and indicated that the appointment with the neurologist would be soon.

On May 7, 2008, Maddox had a telemed evaluation with a doctor from the Virginia Commonwealth University Medical Center (MCV). The doctor reviewed Maddox's medical files and X-rays and asked if an MRI had been performed on the shoulder. Maddox said, "No." Nurse L. Yates said, "Yes," and promised to send the doctor the MRI results when they were located. Maddox complains that before this evaluation, someone disclosed his medical records to MCV without his consent. Maddox's request for a follow up visit with the doctor on June 30, 2008 was denied.

On July 9, 2008, Maddox was transferred to Sussex I State Prison for medical reasons. Officers transported him to MCV on July 14, 2008, only to be told that he was not supposed to

be there, so officers took him back to Sussex I. Maddox claims that he did not see any doctors while at Sussex I.[26]

On December 4, 2008, officials transferred Maddox back to ROSP. He saw Dr. McBride on December 5 and 7, 2008. The doctor said that he would possibly see the orthopedist again and in the meantime, prescribed Tylenol and advised Maddox to manually open his hand to "self-rehabilitate." At a follow up visit with Dr. Smith on February 27, 2009, Maddox explained what had happened during his stay at Sussex I, and Dr. Smith told him that he would reinitiate the process of seeking approval for, and scheduling, an onsite visit with a neurologist at MCV. Dr. Smith states that this process was complicated by representation from MCV staff that they had no records indicating that Maddox had previously been seen by MCV doctors. On March 10, 2009, Maddox signed a release to have his medical records sent to MCV.

In response to Maddox's April 7, 2009 request for a follow up visit with the doctor about his medication, a nurse examined him on April 10, 2009, and Dr. Smith saw him again on April 17, 2008. The doctor reissued Maddox's pain medication and showed him an order for an MRI. He told Maddox that the appointment with the neurologist would be "put off" pending the MRI results. On May 4, 2009, Maddox signed a release for an MRI, which was performed that same day at Mountain View Regional Hospital.

The VDOC approved an orthopedic telemed followup for Maddox on August 19, 2009. An August 21, 2009 scanned view of Maddox's right shoulder revealed no fracture or dislocation

---

[26] Defendants' evidence indicates that Maddox had appointments scheduled on July 14, 2008 with a neurologist and on July 23, 2008 with a neurosurgeon. After some weeks of confusion about records regarding any medical evaluations of Maddox's injury while he was at Sussex I, Dr. Smith undertook to reschedule them once Maddox was returned to Red Onion.

at that time. In his September 25, 2009 consultation, Dr. W. Henceroth, VDOC orthopedist, noted that Maddox had not sustained a dislocation since March 2008, that he had good range of motion, and that no treatment was necessary. As of February 24, 2010, current X-rays, a CT scan, and an MRI of Maddox's shoulder were all normal. Nurse Phipps indicated on that date that although Maddox "complains of pain on occasion, he remains functional and is supported by pain medication and double cuffing. As a result, no outside consultations are pending." (DE 100, Exh. B.)

2.

### a. Notification Problems on March 17, 2008

In Claim 6, Maddox faults various security officers for failing to comply with his requests that they notify the medical department immediately of a new shoulder injury Maddox had sustained when he fell off his sink.[27] This claim fails, because Maddox cannot demonstrate that the security officers knew from symptoms they observed that he had a serious medical need for emergency treatment on March 17, 2008. Maddox's self-diagnosis that the shoulder was "visibly dislocated" is belied by the findings of doctors who ultimately X-rayed and examined the shoulder the next day and determined that it might be a rotator cuff tear, rather than a dislocation. If professionally trained doctors, even after examining X-rays, could not determine the exact nature of the injury or the appropriate treatment without further tests, the security officers cannot be charged with the knowledge that the injury presented a serious medical need for quicker medical attention than Maddox received. As these defendants were thus not deliberately

---

[27] Maddox also has no constitutional claim against any of these defendants related to their alleged interference with his attempts to file emergency grievances. See Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994) (holding that inmates do not have a constitutional right to a grievance procedure).

indifferent, Maddox states no constitutional claim against them concerning their actions on March 17, 2008. Estelle, 429 U.S. at 104-05.

In any event, Maddox's own allegations reflect that the security defendants' alleged actions caused, at most, a few hours' delay of medical evaluation for Maddox's injuries. Maddox states that he first complained about the shoulder injury around 12:40 p.m., Nurse Church saw him during pill pass and observed no emergency need for treatment. When Maddox was able to file an emergency grievance at 4:30 p.m., Nurse Kilgore responded that he had been "seen by medical," referring to the earlier, informal evaluation that Nurse Church had conducted during pill pass, and that no emergency medical need was observed. Moreover, when Nurse Kilgore examined the shoulder four hours later, she did not see any indication that the shoulder was dislocated, but arranged for him to be evaluated by a doctor the next morning. Maddox simply cannot show that the security officers' actions on March 17, 2008 interfered with his ability to obtain timely treatment. Finding no genuine issue of material fact in dispute, the court will grant summary judgment for defendants as to Claim 6.

### b. Nurse Church

Maddox raises two claims against Nurse Church concerning her interaction with him on March 17, 2008. First, he asserts that she was deliberately indifferent to his need to be decontaminated from the OC gas. The record reflects no factual support for this claim. As reflected in the video, Nurse Church advised Maddox to follow cuffing procedures, so that he could be escorted to the shower for decontamination. When he failed to comply with this advice, she told him to wash out his eyes. There is no indication that she knew his water had been turned off, and his behavior did not reflect that he was suffering any great distress from the OC spray at

that time. Thus, the record reflects that she responded reasonably to whatever risk the OC spray posed to Maddox at that point. Farmer, 511 U.S. at 844 ("prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted").

Second, Maddox complains that Nurse Church was deliberately indifferent to his need for emergency treatment for the shoulder injury he suffered later that day. When Nurse Church viewed the injury during pill pass, she made a medical judgment that the shoulder did not appear to be dislocated and reported her observation to Nurse Kilgore. Implicit in this evaluation was her judgment that the injury did not require emergency evaluation or treatment by an expert before Maddox could be examined by a doctor the next day. Moreover, the record as a whole validates her assessment, as it reflects that experts who examined his injury the next day, after viewing X-rays, did not find it appropriate to reset the shoulder or perform immediate surgery at that time. Without a showing that Nurse Church knew of a serious medical need for quicker expert evaluation and treatment of his injury, Maddox's deliberate indifference claim fails. Estelle, 429 U.S. at 104-05. For the stated reasons, the court finds no genuine issues of material fact in dispute, and will grant summary judgment for Nurse Church accordingly.

### c. Nurses Kilgore and Phipps

Maddox complains that Nurse Kilgore failed to promptly and adequately assess his injuries on March 17, 2008. The record offers no support for this claim. At the most, Maddox alleges a disagreement with Nurse Kilgore's assessments, in response to his emergency grievance in the afternoon and during her evening examination of his injury, that the condition at that point presented no need for emergency evaluation or treatment by experts. Disagreements between

patient and medical staff do not rise to constitutional proportions.  Wright, 766 F.2d at 849.

Moreover, Nurse Kilgore responded reasonably to the medical need as she assessed it, by

maintaining Maddox in the medical unit and sending him to the hospital the next day for expert

evaluation.  Farmer, 511 U.S. at 844.  Furthermore, on March 18, 2008, doctors determined from

X-rays that Maddox did not have a dislocated shoulder and did not provide immediate treatment

for the injury, thus verifying Nurse Kilgore's assessment that no emergency treatment was

medically necessary on March 17, 2008.  Finding no genuine issue of material fact in dispute, the

court will grant summary judgment for Nurse Kilgore.

Maddox does not allege facts concerning Nurse Phipps' personal involvement in the

medical evaluation and treatment he received on March 17-18, 2008.  Even if he could prove

such involvement, for reasons already stated, his claims of deliberate indifference to a serious

medical need on that date are not supportable, based on doctors' finding that no immediate

treatment was necessary even later in the day on March 18, 2008.[28]  Estelle, 429 U.S. at 104-05.

To the extent that Maddox is attempting to hold Nurse Phipps liable, as a supervisory official, for

---

[28]  The doctors at Norton Community Hospital who examined Maddox's shoulder on March 18,
2008, diagnosed the injury as a possible rotator cuff tear and recommended that he receive an MRI and
evaluation by an orthopedic specialist.  Although references to these recommendations appear in the
medical notes dated March 19, 2008, it is undisputed that Maddox did not actually undergo an MRI of
that shoulder until more than a year later, in May 2009.  In the meantime, he received pain medication, a
sling, and exercise information, in addition to regular medical evaluation of his symptoms by the
institutional medical staff and an order for special cuffing procedures to avoid harm to the injured
shoulder.  More X-rays were taken of the shoulder in April 2008, and an orthopedic specialist, Dr. Kotay,
evaluated the injury in May 2008.  Neurospecialists were scheduled to evaluate the shoulder in July
2008, while Maddox was at Sussex I, but apparently did not do so.  While the delay of the MRI and
neurology consultations are troubling, in light of the March 18, 2008 diagnosis of a possible rotator cuff
injury, the May 2009 MRI results were normal.  Therefore, Maddox cannot demonstrate that failure to
provide the MRI more promptly constituted deliberate indifference to a serious medical need or that the
delay aggravated his injury in any way.

Kilgore's alleged incompetence, his claim fails, because the court has already concluded that he fails to state any constitutional violation committed by Kilgore. Shaw, 13 F.3d at 799.

### d. The Overall Course of Treatment

Perhaps Maddox is making a more general claim against Nurse Phipps, based on his general dissatisfaction with the evaluation and treatment he received at Red Onion for his shoulder symptoms in 2007-2009. He alleges similar claims against Dr. Smith, complaining about delays in having his shoulder evaluated by specialists, and against Warden Ray and Fred Schilling, VDOC Director of Health Services, complaining that the VDOC-approved system of providing medical treatment to inmates at Red Onion is inadequate. The record as a whole does not support these claims. Maddox's own allegations regarding the medical care he has received reflect that he has seen nurses and doctors on numerous occasions, has consulted with orthopedic specialists, has undergone an EMG test, X-rays, an MRI, and other tests, has received emergency room evaluation and care for acute injuries, and has received medication and medical advice.

Even taking his allegations in the light most favorable to him, Maddox demonstrates, at most, that he did not always get evaluated or treated for his shoulder symptoms as quickly as he believed he should have been, and in the manner that he believed his condition warranted. Prison medical staff members made dozens of professional decisions about Maddox's medical problems over the course of treatment provided for his shoulder—whether and how soon he should be examined for a specific complaint, what sort of examination was appropriate, what the condition was and how it should be treated, what medical tests were necessary and how soon, when outside experts should be consulted, and whether or not their recommendations should be followed, given the inmate's current symptoms and/or recommendations from other experts. Such medical

judgments, whether correct or not in any given situation, do not constitute cruel and unusual punishment. Estelle, 429 U.S. at 107-08. At the most, they constitute medical malpractice, which does not give rise to a constitutional claim actionable under § 1983. Id. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

Moreover, the record offers no support for Maddox's assertions that he has suffered long-term adverse effects because he did not receive different or quicker treatment than that provided to him over the past two and a half years. Current imaging tests indicate that his shoulder is normal. Plaintiff's shoulder remains functional, and the medical staff are of the opinion that any pain or discomfort he experiences related to his shoulder is appropriately addressed by providing him with pain medication and allowing him to be double-cuffed when restraints are necessary. Maddox offers no evidence to dispute this assessment of his current condition, and the court cannot second-guess this medical judgment. Russell, 528 F.2d at 319. For the stated reasons, the court finds no genuine issue of material fact in dispute concerning Maddox's claims regarding his overall course of medical treatment and will, accordingly, grant summary judgment for defendants as to Claims 8, 10, and 11.

**e. Privacy in Medical Records**

In Claim 9, Maddox complains that before a telemed consultation on May 7, 2008, Nurse Yates or some other Red Onion staff member forwarded some of Maddox's medical information to doctors at MCV without his written consent. The court finds no respect in which an inmate, seeking medical treatment of a specific condition, states any federal claim for monetary damages based on the release of some portion of his medical records related to that condition to experts employed by prison officials to offer expert medical consultation concerning that condition. At

the most, these allegations state a claim of medical negligence or a possible violation of state law, which is likewise not actionable under § 1983. Estelle, 429 U.S. at 106. The court will grant defendants' motions for summary judgment as to Claim 9.

## Conclusion

For the stated reasons, the court concludes that defendants' motions for summary judgment must be granted as to all plaintiff's claims under § 1983. Accordingly, the court declines to exercise supplemental jurisdiction over any related state law claims raised in the complaint, pursuant to 28 U.S.C. § 1367(c), and will dismiss such claims without prejudice. An appropriate order will issue this day.

The plaintiff is advised that he may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure by filing a notice of appeal with this court within 30 days of the date of entry of this memorandum opinion and the accompanying order, or within such extended period as the court may grant pursuant to Rule 4(a)(5).

The Clerk is directed to send copies of this memorandum opinion and accompanying order to plaintiff and counsel of record for the defendant.

ENTER: This _29th_ day of July, 2010.

_Glen Conrad_
Chief United States District Judge